Concurring opinion filed by Circuit Judge MILLETT.
MILLETT, Circuit Judge:
After collective-bargaining negotiations soured between Consolidated Communications, Inc. (“Consolidated”) and the International Brotherhood of Electrical Workers, AFL-CIO, Local 702 (“Union”), Union members launched a strike at several company facilities. After the dust settled and the strikers returned to work, Consolidated disciplined several employees for alleged misconduct during the strike and eliminated a workplace position held by a union worker. The National Labor Relations Board found that both Consolidated’s disciplinary actions and its unilateral elimination of a bargaining-unit position violated the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3) and (5). Consolidated now petitions for review of the Board’s decision, while the Board cross-petitions for enforcement of its order.
We enforce the portions of the Board’s order determining that Consolidated’s suspensions of Michael Maxwell and Eric Williamson, as well as the company’s elimination of the bargaining-unit position, violated the Act. However, we grant Consolidated’s petition for review and deny cross-enforcement for that portion of the order addressing Consolidated’s discharge of Patricia Hudson, and remand because the Board applied an erroneous legal standard in evaluating Hudson’s strike misconduct.
I
Consolidated is a telecommunications company that provides commercial and residential telephone, television, and broadband services. The company maintains numerous facilities in Illinois, including a garage in Taylorville and a general warehouse known as the Rutledge Building on 17th Street in Mattoon. Consolidated’s corporate headquarters is also in Mat-toon.
The Union represents a unit of employees at Consolidated’s Taylorville and Mat-toon facilities whose work was covered by a collective-bargaining agreement that expired in November 2012. Numerous bargaining sessions for a new contract failed, and negotiations between Consolidated and the Union stalled. Union members then began a strike on December 6, 2012. Employees picketed at several company locations, including the Taylorville garage, the Rutledge Building, and the Mattoon *6 corporate headquarters. The Union informed the strikers that they could also picket at any commercial sites where Consolidated employees were performing work, a practice known as “ambulatory picketing.” J.A. 183.
During the strike, Consolidated continued to operate through the use of replacement workers, out-of-state employees, and managers. Consolidated hired the Huff-master Security Company to guard the facilities, direct traffic across picket lines, and advise non-striking employees about how to conduct themselves during the strike. Non-striking employees were instructed to be “extremely cautious in their dealing with strikers to ensure everyone’s safety” and to “[r]eport any incidents to the Command Center.” J.A. 59.
The strike lasted almost a week, with the strikers returning to work on December 13, 2012. In the course of the strike, Consolidated received written and verbal reports of six specific incidents of alleged misconduct by strikers Michael Maxwell, Patricia Hudson, Brenda Weaver, and Eric Williamson. After meeting individually with each employee, Consolidated suspended all four employees indefinitely without pay pending investigation of the allegations. Several days later, Consolidated confirmed two-day suspensions for Maxwell and Williamson and discharged Hudson and Weaver.
In early 2013, Consolidated decided to fill Hudson’s job as an Office Specialist in the Fleet Department, but not Weaver’s former position of Office Specialist in the Facilities Department. Consolidated assigned the Fleet Department job, as well as some of Weaver’s former duties, to another bargaining-unit employee. Consolidated did not notify or bargain with the Union in advance of those decisions. Upon learning of them, the Union immediately objected and demanded a return to the status quo and the opportunity to bargain over the changes. In April, Consolidated informed the Union that it was transferring some of Weaver’s former duties outside of the bargaining unit.
The Union filed unfair labor practice charges against Consolidated objecting to both the disciplinary actions and the unilateral elimination of a bargaining-unit position. The General Counsel for the Board subsequently issued a complaint alleging that Consolidated violated Sections 8(a)(3) and (1) of the Act, 29 U.S.C. §§ 158(a)(3) & (1), by discharging Hudson and Weaver and suspending Maxwell and Williamson for alleged .misconduct that the General Counsel alleged either did not occur or was insufficiently egregious to warrant such discipline. The complaint also alleged that Consolidated violated Sections 8(a)(5) and (1) of the Act, 29 U.S.C. §§ 158(a)(5) & (1), by eliminating a bargaining-unit position without notifying or bargaining with the Union.
The case was heard by a National Labor Relations Board Administrative Law Judge, who found that Consolidated acted unlawfully in disciplining Hudson, Weaver, Maxwell, and Williamson. The ALJ declined to rule on the Section 8(a)(5) claim pertaining to the eliminated unit position.
In July 2014, the Board affirmed the ALJ’s rulings, findings, and conclusions. The Board also concluded that Consolidate ed violated Section 8(a)(5) by reassigning and eliminating the job duties of the Office Specialist-Facilities position without notice of bargaining.[1]
II
On review, the Board’s factual findings and application of law to those *7 facts must be sustained if they are “supported by substantial evidence on the record considered as a whole.” 29 U.S.C. § 160(e). While our review is deferential, we will not “rubber-stamp NLRB decisions,” and we “examine carefully both the Board’s findings and its reasoning.” Erie Brush & Mfg. Corp. v. NLRB, 700 F.3d 17, 21 (D.C. Cir. 2012) (internal citations and quotation marks omitted). “[W]e do not reverse the Board’s adoption of an ALJ’s credibility determinations unless * * * those determinations are ‘hopelessly incredible,’ ‘self-contradictory,’ or ‘patently unsupportable.’ ” Cadbury Beverages, Inc. v. NLRB, 160 F.3d 24, 28 (D.C. Cir. 1998) (quoting Capital Cleaning Contractors, Inc. v. NLRB, 147 F.3d 999, 1004 (D.C. Cir. 1998)).
Sections 8(a)(3) and (1) of the Act prohibit an employer from interfering with, restraining, coercing, or discriminating against employees in the exercise of their statutory rights to, among other things, join together in collective action and strike. 29 U.S.C. .§§ 158(a)(3) & (1). Under the Act, an employer ordinarily must reinstate striking employees at the conclusion of a strike. See National Conference of Firemen and Oilers, SEIU v. NLRB, 145 F.3d 380, 384 (D.C. Cir. 1998); NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378-379, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967). However, “serious misconduct by strikers is not protected by the Act,” and an employer’s imposition of “reasonable discipline, including the refusal to reinstate employees for such misconduct, does not constitute an unfair labor practice.” National Conference of Firemen and Oilers, 145 F.3d at 384.
An employer’s discipline of an employee for strike conduct constitutes an unfair labor practice if (i) “the discharged employee was at the time” of the alleged misconduct “engaged in a protected activity,” (ii) the employer knew the employee was engaged in a protected activity, (iii) the alleged misconduct during that protected activity provided the basis for discipline, and (iv) the “employee was not, in fact, guilty of that misconduct.” NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 23, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964).
Not all misconduct is sufficient to disqualify a striker from the Act’s protection, however. See Allied Indus. Workers, AFL-CIO Local Union No. 289 v. NLRB, 476 F.2d 868, 879 (D.C. Cir. 1973) (“[N]ot every incident occurring on the picket line, though harmful to a totally innocent employer, justifies refusal to reemploy a picketing employee for acts that exceed the bounds of routine picketing.”) (quoting Montgomery Ward & Co. v. NLRB, 374 F.2d 606, 608 (10th Cir. 1967)); Coronet Casuals, 207 NLRB 304, 304 (1973) (“[N]ot every impropriety committed in the course of a strike deprives an employee of the protective mantle of the Act.”). Indeed, this court has previously noted that “[cjlearly some types of impulsive behavior must have been within the contemplation of Congress when it provided for the right to strike.” Allied Indus. Workers, 476 F.2d at 879.
Consequently, “the employees’ right to organize and bargain collectively” must be balanced “against the employer’s right to maintain order and respect and the public’s right to safety.” Allied Indus. Workers, 476 F.2d at 879. Striker misconduct justifies an employer’s disciplinary action if, “ ‘under the circumstances existing, it may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act,’ ” including the right to refrain from striking. Clear Pine Mouldings, 268 NLRB 1044, 1046 (1984), enf'd, 765 F.2d 148 (9th Cir. 1985), cert. denied, 474 U.S. 1105, 106 S.Ct. 893, 88 L.Ed.2d 926 (1986) (quoting NLRB v. W.C. *8 McQuaide, Inc., 552 F.2d 519, 528 (3d Cir. 1977)). As the Board explained in Clear Pine Mouldings,
the existence of a “strike” in which some employees elect to voluntarily withhold their services does not in any way privilege those employees to engage in other than peaceful picketing and persuasion. They have no right, for example, to threaten those employees who, for whatever reason, have decided to work during the strike, to block access to the employer’s premises, and certainly no right to carry or use weapons or other objects of intimidation. As we view the statute, the only activity the statute privileges in this context, other than peaceful patrolling, is the nonthreatening expression of opinion, verbally: or through signs and pamphleteering # N< *
268 NLRB at 1047.
“The Clear Pine standard is an objective one” and “does not call for an inquiry into whether any pai’ticular employee was actually coerced or intimidated.” Mohawk Liqueur Co., 300 NLRB 1075, 1075 (1990). Rather, “‘[a] serious threat may draw its' credibility from the surrounding circumstances and not from the physical gestures of the speaker,’ ” and an employer need not “ ‘countenance conduct that amounts to intimidation and threats • of bodily harm.’ ” Clear Pine Mouldings, 268 NLRB at 1046 (quoting Associated Grocers of New England v. NLRB, 562 F.2d 1333, 1336 (1st Cir. 1977), and W. C. McQuaide, Inc., 552 F.2d at 527).
The striker-misconduct standard thus- offers misbehaving employees greater protection from disciplinary action than they would enjoy in the normal course of employment. See Midwest Regional Joint Board v. NLRB, 564 F.2d 434, 440 (D.C. Cir. 1977) (“Absent a showing of anti-union motivation, an employer may discharge an employee for a good reason, a bad reason or no reason at all without running afoul of the labor laws.”).
There is a “burden-shifting element to the Bumup & Sims test” for determining whether employer discipline of a striker amounts to án unfair labor practice. Shamrock Foods Co. v. NLRB, 346 F.3d 1130, 1134 (D.C. Cir. 2003). The General Counsel must initially establish that the disciplined employee was a striker and that the employer took action against him or her for conduct associated with the strike. See In re Detroit Newspaper Agency, 340 NLRB 1019, 1024 (2003). The burden then shifts to the employer to demonstrate an honest belief that the disciplined employee engaged in misconduct. See id.; Shamrock Foods Co., 346 F.3d at 1134. Upon that shoydng, the burden shifts back to the General Counsel to show that the misconduct did not occur or that it was not serious enough to forfeit the protection of the National Labor Relations Act and to warrant the discipline imposed. See Shamrock Foods Co., 346 F.3d at 1134; In re Detroit Newspaper Agency, 340 NLRB at 1024; Burnup & Sims, 379 U.S. at 23 n.3, 85 S.Ct. 171. It is the “General Counsel’s obligation to carry the ultimate burden of proving that illegal discrimination has occurred,” and “[t]o the extent that there is a lack of evidence” on either the absence of misconduct or the improper response of the employer, the dispute “must be resolved in favor of the employer.” Axelson, Inc., 285 NLRB 862, 864 (1987); see also Shamrock Foods Co., 346 F.3d at 1135 (The “General Counsel has the burden of showing that the employee did not, in fact, commit the misconduct.”) (internal quotation marks and citation omitted).
IH
A. Maxwell
Michael Maxwell is a janitor at Consolidated. On the morning of Decern- *9 ber 8, 2012, he and several other bargaining-unit employees picketed Consolidated’s Taylorville garage, walking back and forth across the driveway entrance to the parking lot.
That morning, strike-replacement workers Leon Flood and Frank Fetchak left the parking garage in a company van with Flood driving and Fetchak in the passenger seat. As the van approached the exit, Maxwell and others in the picket line blocked the van from leaving. Flood stopped the van briefly and then began inching slowly forward towards the picketers. Maxwell continued to walk back and forth in front of the van between the headlights.
At some point, Maxwell’s elbow or forearm made contact with the hood of the van. According to an email and incident reports written by Flood, Maxwell intentionally blocked the path of the van and leaned on the hood. Maxwell, however, testified. that the van never stopped, but instead “[a]ll of a sudden took off’ and hit him, causing him to bend in towards the van and brace himself against the hood with his arm. J.A. 341. Flood’s passenger Fetchak testified that Maxwell “laid on the van,” id. at 572, or “lean[ed] on the hood” for “less than a minute,” id. at 575. Maxwell then moved around to the driver’s side of the van. Maxwell claimed to have been scrambling to get out of Flood’s way, but then the van moved forward and hit him again, pushing him to the driver’s side. He gave Flood the middle finger and uttered its associated obscenity. Id. at 342; see also id. at 29, 574. Maxwell testified that he sustained a “slight yellowish bruise” on his right hip as a result of the incident. Id at 346.
Consolidated informed Maxwell about “reports of this] harassing, threatening, [and] intimidating behavior towards other [Consolidated] employees,” J.A. 30, and suspended him for violating the company’s “handbook/workplace ; violence policy,” which prohibits “any acts or threats of violence,” id. at 22-23. See also id. at 30 (“You struck the .vehicle, proceeded to the front of the vehicle and leaned on the hood for an extended period of time impeding [Flood’s] progress, and then proceeded around the vehicle to the driver’s window and verbally harassed him.”).
Adopting the ALJ’s factual findings, thé Board concluded that Maxwell “did not intentionally strike Leon Flood’s vehicle and did not threaten or intimidate Leon Flood.” J.A. 12. Instead, the Board determined that Flood hit Maxwell with the van, causing Maxwell to fall forward and brace himself by placing his forearm on the hood. While Maxwell “briefly impeded Flood’s progress in leaving the [Taylor-ville] garage,” “he did so no more than the other five picketers” at the scene. Id. at 4.
In reaching those findings, the ALJ credited Maxwell’s account, rather than Flood’s written report (Flood did not testify at the hearing), reasoning that the testimony of Fetchak did not contradict Maxwell “in any material way.” J.A. 4 n.5. Consolidated argues that finding was erroneous because Fetchak and Maxwell gave disparate testimony on several key points. For example, Maxwell claimed the van “[t]ook off like a bat out of hell,” id. at 340, whereas Fetchak testified that Flood was forced to stop the van close to. the picket line and to inch slowly forward. Consolidated also notes that Fetchak testified that Maxwell put his arm- on the hood and leaned against the van, while Maxwell claimed that the van hit him twice and that he was merely bracing himself.
Those distinctions, however, are not so material as to make the fact findings clearly erroneous. Maxwell’s “bat out of hell” comment refers to the vehicle’s movement from when Maxwell first saw the van, *10 “coming out of the building,” not at the moment when he claims to have been hit. J.A. 340. While Maxwell maintained that the van never stopped, he did concede that the van was “going slower” when it allegedly hit him. Id. at 351-352. As for Maxwell’s contact with the van, Fetchak acknowledged that “the reason [Maxwell] leaned his elbow on the van could have been because he was hit by the van on his hip.” Id. at 587 (conceding that this “could be an explanation” for the contact).
Importantly, both Fetchak and Maxwell indicated that Maxwell’s encounter with the van was fleeting, not for “an extended period of time,” J.A. 30, as Consolidated alleges. See id. at 575 (Fetchak testifying that Maxwell leaned on the hood “15 seconds or so. * * * It was less than a minute.”); id. at 343 (Maxwell testifying it was “a minute at the most” from when he first saw Flood to when Flood pulled out of the driveway). There is also no evidence whatsoever that Maxwell ever “struck” the van; in fact, Fetchak’s testimony indicates otherwise. See id. at 580 (testifying that he did not see Maxwell raise his arm to strike the van); id. at 586 (“[Maxwell] didn’t hit the van. * * * I don’t think he struck it. * * * The definition of strike is making a striking motion, no, I don’t believe he did that.”). Thus, it was not “hopelessly incredible, self-contradictory, or patently unsupportable,” Cadbury Beverages, 160 F.3d at 28 (internal quotation marks omitted), for the ALJ to credit Maxwell’s account and find that Flood hit him. See also E.N. Bisso & Sons, Inc. v. NLRB, 84 F.3d 1443, 1444-1445 (D.C. Cir. 1996) (“[Credibility determinations may not be overturned absent the most extraordinary circumstances such as utter disregard for sworn testimony or the acceptance of testimony which is on its fac[e] incredible.”) (quoting Amalgamated Clothing and Textile Workers Union v. NLRB, 736 F.2d 1559, 1563 (D.C. Cir. 1984)).
Accepting those fact findings as supported by substantial evidence, the Board did not err in concluding that Maxwell’s actions were not the type of seriously coercive or intimidating behavior that forfeits a worker’s protection under the National Labor Relations Act. See, e.g., Consolidated Supply Co., Inc. & Successor Consol. Supply of Madison, Inc., 192 NLRB 982, 988-989 (1971) (blocking a company truck “momentarily” is “the sort of trivial, rough incident ] which [is] to be expected during a long, contested strike where an employer attempts to continue operating with non-strikers”); Medite of New Mexico, Inc. v. NLRB, 72 F.3d 780, 791 (10th Cir. 1995) (a “brief incident” in which several picketers gathered around a vehicle, called the driver a “scab,” and struck the car with picket signs, “does not amount to the type of serious conduct that would intimidate nonstriking employees from crossing the picket line and exercising their Section 7 rights”).
By contrast, the cases on which Consolidated relies all involved more extreme or violent contact with and obstruction' of non-strikers’ vehicles than Maxwell was found to have engaged in here.[2]
*11 Because substantial evidence supports the Board’s finding that Maxwell did not engage in misconduct justifying suspension, we deny that portion of Consolidated’s petition and enforce the Board’s order as it applies to Maxwell.
B. Williamson
Eric Williamson, a switchman at Consolidated, was suspended for two separate incidents during the strike. Substantial evidence supported the Board’s determination that neither instance of alleged misconduct was severe enough to warrant his suspension.
One evening during the strike, Williamson and other strikers stood along the driveway of the Rutledge Building parking lot waving signs and chanting. At around 5:00 p.m., non-striking employee Dawn Redfern drove her car as part of a slow caravan of vehicles leaving the parking lot. According to Redfern, she was turning right out of -the parking lot .when she heard a loud smack and immediately stopped her car. Turning her interior light on and rolling down her car window» she noticed that the passenger-side mirror was folded in. Redfern addressed a group of picketers, yelling, ■ “you just, hit my car.” J.A. 611. Williamson purportedly responded, “No, you hit me.” Id. at 612. A Huff-master security guard came over and instructed Redfern to put her window up and keep driving, which she did. Redfern’s husband later pushed the mirror back to its normal position. The car was not damaged.
Williamson offered a different account of the incident. He acknowledged that he had been standing near Redfem’s car as she pulled out, and that he “made sure she [had] seen [his] sign” and “tried to yell ‘scab.’ ” J.A. 443. Williamson claimed that Redfern’s passenger-side mirror “grazed [his] whistle on [his] chest,” and “flexed in and flexed back.” Id. Redfern then allegedly “hammered on her brakes[,] rolled her window down” and accused Williamson of breaking her mirror. Id. Williamson responded that she had hit him, and then he turned and walked away. He asked a Mat-toon Police Department officer at the picket line if the officer had seen what had happened; the officer advised Williamson that he had done nothing wrong. During his testimony, Williamson repeatedly denied striking or pushing the mirror.
Williamson continued to picket at the Rutledge Building the following day. Non-striker Tara Walters testified that, as she arrived for work in the morning, Williamson looked towards her, grabbed his crotch, and “lifted up as a mean, hateful gesture.” J.A. 629-630. Williamson denied grabbing his crotch, claiming that he just yelled “scab” at Walters. Id. at 440-441.
Consolidated accused Williamson of “threatening and intimidating a female * * * employee by striking her vehicle while * * * standing on the picket line,” and of “sexual harassment” in “making inappropriate gestures toward a female * * * employee while she was parking her vehicle,” J.A. 40. Williamson was suspended for violations of the “handbook/workplace violence policy” and the “handbook/sexual harassment policy.” Id. at 31-32.
*12 The Board found no factual basis for Consolidated’s conclusion that Williamson intentionally struck Redfern’s car mirror. That decision, is amply supported by the record — or, more accurately, the utter lack of any record evidence that Williamson intentionally struck Redfern’s mirror as she drove by. Redfern herself conceded that she did not see “who did it,” J.A. 619, or have any basis for concluding that Williamson acted with intentionality to damage her mirror. Video footage of the picket line around that time only shows Redfern’s car driving by a group of strikers, with no footage of anyone at all coming into contact with the mirror. Accordingly, we uphold the Board’s determination that Williamson did not engage in any misconduct with respect to Redfern.
With respect to the Tara Walters incident, the Board discredited Williamson’s testimony and found that he did engage in misconduct by grabbing his crotch and making an obscene gesture toward Walters. The Board also held, however, that Williamson’s actions were not sufficiently egregious to warrant suspension.
Consolidated argues (Br. 51) that the Board improperly “inferred a legal standard of violence” as necessary to permit discipline. That misreads the decision. The Board, in fact, acknowledged that Williamson’s gesture was “totally uncalled for, and very unpleasant,” but nonetheless concluded that his actions could not objectively be perceived “as an implied threat” of the kind that would coerce or intimidate a reasonable employee from continuing to report to work during the strike. J.A. 13. Given the rough-and-tumble nature of picket lines and the fleeting nature of Williamson’s offensive misconduct, we cannot conclude that the Board erred in its assessment of the objective impact of this particular conduct in this instance. See Allied Indus. Workers, 476 F.2d at 879 (“ ‘Impulsive behavior on the picket line is to be expected especially when directed against nonstriking employees or strike breakers.’”) (quoting Montgomery Ward & Co., 374 F.2d at 608); NMC Finishing v. NLRB, 101 F.3d 528, 532 (8th Cir. 1996) (noting the. “rough and tumble economic activity permitted by the policies established by Congress through the NLRA”).[3]
C. Hudson
At the time of the strike, Patricia Hudson was an Office Specialist in the fleet department of Consolidated. In one day, she purportedly participated in three back-to-back incidents of driving her car in a manner that obstructed and trapped vehicles in which non-striking workers were driving. Concluding that Hudson had engaged in “harassing, intimidating, threatening and reckless behavior” towards nonstrikers with “extremely dangerous vehicular activity on the strike line and on the public roads,” J.A. 52, Consolidated discharged Hudson for violation of the “handbook/workplace violence and/or employee conduct and work rules policies,” id. at 41.
The Board ruled that Hudson did not engage in any misconduct that would warrant discharge. The Board was two-thirds *13 correct. Substantial evidence supports its findings that Hudson’s -conduct toward non-strikers Sarah Greider and Kurt Rankin was not misconduct. But in analyzing the incident involving non-striker Troy Conley, the Board misapplied the governing legal standard,
I. The Greider and Rankin Incidents
On the morning of December 10, 2012, Hudson and Brenda Weaver walked the picket line at the Rutledge Building. At around 10:00 a.m., Hudson and Weaver decided to drive over to corporate headquarters to join the picket line there. Hudson and Weaver drove separately, with Hudson in front and Weaver behind.
Non-striker Sarah Greider left the Rutledge Building parking lot at about that same time. Greider claims that, as she approached the parking lot exit and prepared to turn onto 17th Street, Hudson pulled in front , of her and Weaver pulled up behind, blocking her in. Greider testified that Hudson drove slowly and stopped and started several times, while Weaver followed immediately behind so that Greider could not back up. With parked cars and picketers on both sides of the roadway, 17th Street had been reduced to one lane, so Greider could not get around Hudson. After approximately 135-165 feet, Greider turned into the parking lot of an automobile dealership and cut across to a parallel street. Weaver did not follow her.
Greider called the Command Center and reported that Hudson and Weaver had “blocked [her] in.” J.A. 653. She later completed an incident report claiming that Hudson had “refused to move or moved very slowly” in front of her car. Id. at 47-49.
Jonell Rich, another non-striker who witnessed the incident, testified that Hudson was in front of Greider going “very slow, stopping, starting” on 17th Street, “and it stayed that way until [Greider] was able to turn into the [auto dealership] lot.” J.A. 689. Immediately after the incident, Rich texted Greider: “I just saw what Pat Hudson did to you.” Id. at 691.
Later that morning, Hudson and Weaver returned to the Rutledge Building, with Hudson driving her car and Weaver in the backseat. Around that time, manager Kurt Rankin drove his car toward an exit of the Rutledge parking lot. Rankin testified that Hudson’s car was parked to the side of the road and surrounded by people, but that as soon as he came up- to the exit, “everybody turn[ed] around and got her vehicle moving in front of [him]” by “motioning” her toward the right. J.A 312-313. A Huff-master guard held Rankin up as Hudson passed the exit. Rankin then turned right onto 17th Street behind Hudson, who was driving very slowly.
Rankin testified that Hudson “stop[ped] the brakes, move[d], stop[ped] the brakes,” so that he was continually moving very slowly as' Hudson “controll[ed] the speed at which [he] could exit and get out of there.” J.A. 320, Hudson testified, however, that she was driving slowly because there were “picketers, cars parked on the side of the road, people crossing the road, [and] people coming in and out of [the auto dealership].” Id. at 529. When Rankin tried to speed úp and go around Hudson, she allegedly swerved over into the left lane to prevent him from passing. As soon as he got past the vehicles parked along the road, Rankin put his truck into four-wheel drive and went around Hudson on the left by driving through a ditch. Rankin later filled out incident reports about the encounter.
Three non-striking employees — Tara Walters, Jonell Rich, and Bernice Dasen-brock — witnessed the incident, testifying that Hudson proceeded very slowly in *14 front of Rankin and moved to the left when Rankin tried to pass. ■
The Board ruled that there was no misconduct by Hudson in either incident. The Board found that on both occasions Hudson’s car ended up in front of the non-strikers by coincidence due to the actions of the Huffmaster guard directing traffic leaving the parking lot. The Board also found that Hudson was driving slowly because of activity and congestion on the road, not to harass or annoy Greider or Rankin. Finally, the Board found that Hudson did not repeatedly start and stop in the road in front-of Greider and Rankin. In so finding, the Board dismissed the witnesses’ testimony as inconsistent or motivated by animus towards Hudson, and relied in part on the fact that neither the nonstrikers nor Consolidated reported the incidents to the Mattoon Police Department.
Once again, substantial evidence supports the Board’s conclusions. Video footage of the picket line shows Huffmaster personnel directing cars out of the parking lot, and in both incidents, a guard holds up the non-striker’s car as Hudson’s car drives by on 17th Street. In addition, record evidence supports the Board’s finding that Hudson’s slow pace was due to all the activity and congestion in the roadway rather than an intentional effort to harass or block Greider and Rankin. For example, Police Chief Jeffrey Branson testified that 17th Street is a, “very well traveled road,” and that when he first arrived at the Rutledge Building that morning, he “was upset because the road was so congested.” J.A. 370-371. Chief Branson also observed “a large crowd in the roadway,” id. at 372, and noted that cars leaving the facility were “taking care, driving slow, and they were all back to back,” going “[t]wo miles an hour” “because the crowd was so close,” id. at 373-374.
Similarly, Union representative Brad Beisner testified that 17th Street was significantly narrowed during the strike due to picketers parking along both sides of the road, and people getting in and out of their cars to stay warm and dry. Beisner also testified that members of the public and strikers were “driving slowly” on 17th Street during the strike, and that he would go five to ten miles an hour. J.A. 191. Video footage of the area during the strike shows picketers walking up and down the road holding signs and getting close to cars.
The Board also found no credible evidence that Hudson had started and stopped repeatedly in front of Greider and Rankin. Greider made no mention of Hudson stopping and starting in her incident report, and there is no record of her making such a claim to Consolidated managers at the Command Center at the time. The video footage of the Greider Incident, though limited, also does not show any evidence of stopping and starting. Rich’s testimony was inconsistent as to whether and how often Hudson stopped in front of Greider. Compare J.A. 689 (testifying that she did not know if Hudson stopped more than once or whether Hudson actually came to a complete stop), with id. at 700-702 (testifying that she saw Hudson come to a complete stop in front of Greider twice).
Rankin testified that Hudson would “stop the brakes, move, stop the brakes,” J.A. 320, but only noted Hudson “at some time totally stopp[ing]” in one incident report. Video footage of the incident shows Hudson’s car slowing down after Rankin’s truck turns behind it, and the two vehicles get very close to each other as they drive up 17th Street, but Hudson’s car does not ever fully stop within view of the camera. Other testimony about the incident offered equivocal sup *15 port at best for Rankin’s version of events. Walters testified that she did not see Hudson start and stop in front of Rankin, and Rich mentioned the two vehicles coming to a complete stop only when Rankin attempted to go around Hudson at some point.[4]
The Board also found conflicting evidence regarding Rankin’s claim that Hudson moved to the left of the road to prevent him from passing. The allegation was not in Rankin’s incident reports, and Rankin never told Consolidated prior to Hudson’s discharge that she swerved, or that he twice tried to pass her. To be sure, Walters and Rich testified that they saw Hudson move to the left in front of Rankin, but the general reliability of their testimony was undermined by noteworthy gaps or inconsistencies. For example, neither Walters nor Rich remembered any vehicles passing Hudson and Rankin going south on the other side of 17th Street— something about which Rankin, Weaver, and Hudson all testified.
When confronted with competing versions of evidence, we defer to the Board’s credibility determinations absent the starkest error. See NLRB v. Augusta Bakery Corp., 957 F.2d 1467, 1477 (7th Cir. 1992). We therefore hold that substantial evidence underlay the Board’s determinations that Hudson did not engage in misconduct in the Greider and Rankin incidents.

2. The Conley Incident

Between the Greider and Rankin Incidents, as Hudson and Weaver were en route in separate cars to picket at Consolidated’s corporate headquarters,. Hudson noticed a company truck on Route 16, a four-lane highway in Mattoon. Manager Troy Conley was driving, and replacement worker Larry Diggs was a passenger. Hudson testified that she decided to follow the truck to see if it was traveling to a commercial worksite where striking employees could set up an ambulatory picket. Weaver followed her. What happened next is strongly disputed.
Conley testified that he was driving east in the right lane on Route 16, when he heard honking and saw Weaver drive up in the left lane beside him with a picket sign in her passenger seat. She went past Conley’s truck, signaled and moved into the right lane in front of him. Less than a minute later, Conley saw Hudson drive up in the left lane, pass him, and proceed parallel to Weaver. Conley then “saw some hand motioning going on by Pat [Hudson], and they immediately slowed both cars down.” J.A. 537.[5] Conley did not know how fast any of the cars were traveling, and he *16 conceded that Weaver and Hudson could have been driving the speed limit while in front of him.[6]
Conley testified that he slowed down, signaled, and went into the left lane behind Hudson to see if she would let him pass. She did not. Conley then moved back into the right lane behind Weaver. At some point, three cars came up behind Hudson in the left lane, and she moved in to the right'lane ahead of Weaver to allow them to pass her. Conley signaled left and moved into the left lane behind the third car, but again could not pass because Hudson moved back into the left lane, intentionally cutting him off. Conley slowed down and moved back into the right lane behind Weaver,
Conley subsequently turned off of the road, even though it was not the most direct route to the job site, because he “was feeling very harassed” and “was trying to avoid conflict.” J.A. 540. As a result, Conley had to drive a longer route to his destination. Once he reached the job site, Conley called the Command Center to report what had happened, and later filled out an incident report.
. Diggs, Conley’s passenger, testified that he saw one car come speeding up beside their truck, stop and look for a moment, and then pull in front of the truck. .He testified that a second car then pulled up beside the first car and “both of them slowed down at a fairly fast pace.” J.A. 591. Diggs explained that, “after [other] cars started stacking up behind [the truck],” he “saw some motion between the two cars that were in front of us.” Id. at 592. The car in the left lane (Hudson) pulled in front of the car in the right lane (Weaver) to let the stacked cars come through. But when Conley attempted to pass, the two cars “pulled back, paralleling each other, and continued to block us from going at the normal speed that we were trying to travel at.” Id. Diggs did not know whether Hudson and Weaver were driving at the speed limit and conceded that they could have been, but added that “they were traveling much slower than everyone else was traveling prior to them pulling in front of us.” Id. at 597.
Weaver and Hudson had a different recollection from Conley and Diggs) According to Weaver, she had decided to pull up beside the truck to “see who was driving * * *, so that if we followed him to a site where we could picket, we could report it back to the Union.” J.A. 413. She also said that she wanted to And out if the driver was someone with “the credentials to drive the type of truck he[ ] [was] driving to do the work,” such as a commercial driver’s license, id. although she conceded that she was unaware of any special requirements to drive a pickup truck.[7] Weaver testified that she was driving at “normal speed— the speed limit,” J.A. 403, and that Hudson did not cut Conley off.
Hudson testified that she had no idea why Weaver passed Conley or “what her intentions were,” but she also passed Conley in order to “stay with Brenda [Weaver].” J.A. 481, 516-518, Hudson denied that she and Weaver paralleled their vehicles in front of Conley to create a rolling blockade or. that she ever cut off Conley. Instead, Hudson said she just passed Conley in the left lane and then pulled into the right lane between Weaver and Conley. She also did not recall Conley ever changing lanes or trying to pass,
*17 Hudson and Weaver did not follow. Conley after he turned off of the road because they could not turn then- cars around at that point in the highway. Hudson and Weaver also testified that, because Conley turned off, they each assumed he was heading to a residential, not a commercial, location, where strikers could not picket.
Consolidated argues that the Conley Incident, which occurred on a public highway approximately three miles away from the picket line, should not have been subject to the striker misconduct standard at all, but instead should have been evaluated as ordinary employee misconduct. Consolidated also argues that, even under the striker misconduct standard, Hudson’s behavior was sufficiently serious to forfeit the protection of the National Labor Relations Act. We reject Consolidated’s first argument, but conclude that the Board committed reversible legal error in - evaluating Hudson’s misconduct.
On the question of whether the Conley'incident qualified as strike-related behavior, the General Counsel bears the burden of showing that Hudson’s conduct occurred “in the course of’ the strike. Shamrock Foods, 346 F.3d at 1136; Burnup & Sims, 379 U.S. at 23, 85 S.Ct. 171. Conduct need not occur at the picket line to be “in the course of protected activity.” Confrontations between striking and nonstriking employees are typically treated as strike-related conduct even when they occur miles away from the picket line or strike site. See, e.g., Consolidated Supply Co., 192 NLRB at 988-989 (following company truck onto roadway, forcing it to drive slowly, and blocking it); Axelson, 285 NLRB at 865 (following nonstriker home, cruising slowly past his house, and parking close enough to see and be seen); Gibraltar Sprocket Co., 241 NLRB 501, 501-502 (1979) (following non-striker’s car); Otsego Ski-Club-Hidden Valley, Inc., 217 NLRB 408, 413 (1975) (same); Federal Prescription Serv, Inc., 203 NLRB 975, 993 (1973) (same).
For example, in Detroit Newspaper Agency d/b/a Detroit Newspapers v. NLRB, 342 NLRB 223, 236-237 (2004), a striker had parked in front of a Cracker Barrel Store along with his wife and two young children when he noticed a company van parked nearby. The striker and his family engaged in a confrontation with the driver in which they repeatedly called him a “scab” and slapped the driver’s van. Id. at 236. The employer discharged the striker, reasoning that, “because there was no picket line or any strike-related activity going on in the vicinity,” the striker-misconduct analysis should not be applied. Id. The Board disagreed, finding that the striker “was on strike at the time of this incident, which' involved his attempt to remonstrate with an employee concerning his status as a strike replacement, and that in doing so he was exercising rights protected by'the Act.” Id. The Board further explained that, to obtain protection under the striker-misconduct standard, “[t]here is no requirement that” the employee “be a part of some kind of formal strike-related activity.” Id. The Board also noted “that the [employer] considered [the discharged employee] to be a striker, and that it handled the matter according to the procedures it had set up for reporting, investigating, and taking action on incidents of alleged misconduct by striking employees.” Id.
In other words, geography by itself is not dispositive of whether conduct is strike related. The central consideration instead is whether the employee undertakes the conduct for a purpose related to or in furtherance of the strike. See Burnup & Sims, 379 U.S. at 23-24, 85 S.Ct. 171. Moreover, Consolidated’s reliance on location is particularly inapt here because the *18 company had facilities in multiple locations and worksites in still more.
Accordingly, Hudson’s conduct falls comfortably within the zone of strike-related activity covered by the National Labor Relations Act. The Conley incident took place when Hudson was traveling between picket sites and was scoping out potential alternative locations for ambulatory pickets. Moreover, Consolidated itself must have understood that strike-related purpose because it treated the Conley Incident as striker misconduct, dealing with Hudson through its established procedures for such conduct.[8]
However, we vacate the Board’s determination that Hudson did not engage in misconduct punishable under the Act because the Board’s determination rests on a misapplication of the Clear Pine Mouldings standard and the Bumup & Sims burden of proof.
The central legal question before the Board was whether Hudson’s driving behavior — on a public highway with vehicles traveling at speeds of 45 to 55 mph, and with uninvolved third-party vehicles in the area — “may reasonably tend to coerce or intimidate” Consolidated employees, like Conley and Diggs. Clear Pine Mouldings, 268 NLRB at 1046. The burden of proof on that question rests squarely on. the General Counsel’s shoulders. The General Counsel must establish either that no misconduct occurred, or that the misconduct was not of sufficient severity to forfeit the law’s protection of striker activity. See Axelson, 285 NLRB at 864; Schreiber Mfg., 725 F.2d at 416.
The Board misapplied that standard here. The Board decision stressed the “absence of violence.” J.A. 12; see id. at 9-10. But that asked the wrong question. The legal test to be applied is straightforwardly whether the striker’s conduct, taken in context, “reasonably tended to intimidate or coerce any nonstrikers.” Batesville Casket Co., 303 NLRB 578, 581 (1991); see Clear Pine Mouldings, 268 NLRB at 1045-1046 (expressly rejecting a requirement of violence and instead adopting an “objective test” of “whether the misconduct is such that, under the circumstances existing, it may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act”) (emphasis added) (internal quotation marks and citations omitted). While violence or its absence’ can be relevant factors in that reasonableness analysis, the Board had to take the next analytical step. It had to consider, consistent with precedent,, all of the relevant circumstances, and evaluate the objective impact on a reasonable non-striker of misconduct committed on a high-speed public roadway with third-party vehicles present. See, e.g., Oneita Knitting Mills, Inc. v. NLRB, 375 F.2d 385, 392 (4th Cir. 1967) (strikers who drove their car in front of a nonstriker’s car, would not permit the non-striker to pass, and shouted obscene remarks and names had engaged in misconduct “which was calculated to intimidate the nonstrikers, and which was inherently dangerous in that it involved obstruction of the public highway”); International Paper Co., 309 NLRB 31, 36 (1992) (striker engaged in “hazardous driving designed * * * to intimidate replacement employees and other of Respondent’s personnel,” including following non-strikers cars “dangerously close” with his truck, driving and weaving alongside them closely, and “after passing them, driving at a speed designed to assure only a small *19 separation between the two vehicles thus creating a danger of collision”), enf'd sub nom. Local 14, United Paperworkers Int’l Union v. NLRB, 4 F.3d 982 (1st Cir. 1993) (Table).
Compounding its error, the Board held that “any ambiguity as to whether [Hudson’s misconduct] was serious enough to forfeit the protection of the Act should be resolved against [Consolidated].” J.A. 13. That improperly shifted the burden of proof from the General Counsel to Consolidated. Because the General Counsel bears the burden of proving that the misconduct is shielded by the Act, any ambiguity or equivocation in' the evidence on the question of the conduct’s seriousness “must be resolved in favor of the employer[.]” Axelson, 285 NLRB at 864.[9]
Those legal errors in application of the striker misconduct standard require that we grant this portion of Consolidafed’s petition for review, vacate .the Board’s decision on Hudson’s discharge, and remand for further proceedings.[10]
ÍV
Consolidated argues lastly that .the Board failed to make the necessary findings of fact and provided no legal analysis in determining that Consolidated violated Sections 8(a)(5) and (1) of the Act, 29 U.S.C. §§ 158(a)(5) & (1), in unilaterally eliminating the Office Specialist-Facilities position. That claim has no merit.
It is well-established that an employer commits an unfair labor practice if it makes a unilateral change in a term or condition of employment involving a mandatory subject of bargaining without bargaining to impasse. See Brewers and Maltsters, Local Union No. 6 v. NLRB, 414 F.3d. 36, 41-42 (D.C. Cir. 2005); Litton Financial Printing Div. v. NLRB, 501 U.S. 190, 198-199, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991). The elimination of bargaining-unit jobs is a mandatory subject of bargaining within the meaning of Section 8(a)(5) of the Act. See Finch, Pruyn & Co., Inc., 349 NLRB 270, 277 (2007) (“The Board has long held the elimination of unit jobs, albeit for economic reasons, is a matter within the statutory phrase ‘other terms and conditions of employment’ and is a mandatory subject of bargaining[.]”) (citation omitted); Regal Cinemas, Inc. v. NLRB, 317 F.3d 300, 310-312 (D.C. Cir. 2003) (company violated Section 8(a)(5) in eliminating bargaining-unit positions and transferring work to managers without first bargaining with union).
Here, the Board specifically found that Consolidated decided in January or February 2014 not to fill Brenda Weaver’s job as the Office Specialist in the Facilities Department, and assigned some of the duties of that position to another position. The Board also found that Consolidated did not provide the Union with advance notice or an opportunity to bargain about its decision to eliminate the position, which reduced the size of the bargaining unit.
Because Consolidated had a duty under settled law to notify and bargain with the Union before reassigning job duties and eliminating the Office Specialist-Facilities position, the Board properly concluded that Consolidated violated Section 8(a)(5). *20 Those essential facts are all that is necessary to find a violation of the duty to bargain. See Finch, Pruyn & Co., 349 NLRB at 277 (“It is undisputed that the [employer] never bargained with [the union] over the elimination of the [unit] position. The [employer]’s unilateral action and failure to fulfill its bargaining obligation is thus plainly established on the record before us.”).
Consolidated argues that the parties stipulated that Weaver’s position of Office Specialist was never “eliminated,” and that Consolidated continues to employ Office Specialists in the bargaining unit. But that misreads the stipulation. It does not say that the Office Specialist-Facilities position was preserved. The stipulation instead reiterates that Consolidated planned to abandon filling the position and to transfer Weaver’s duties to other employees.[11] That Consolidated continues to employ Office Specialists elsewhere in the company is beside the point. The bargaining unit is still down by one if Weaver’s position is eliminated.
Consolidated also contends that it has responded and agreed to the Union’s request for bargaining. Perhaps. But that was only after Consolidated had already decided to eliminate the Office Specialist-Facilities position. That does not suffice. The bargaining must come before the position is eliminated. See Brewers and Maltsters, 414 F.3d at 42 (“[A]n employer’s unilateral change in a term or condition of employment without first bargaining to impasse violates section 8(a)(5) and (1).”) (emphasis added); International Ladies’ Garment Workers Union v. NLRB, 463 F.2d 907, 919 (D.C. Cir. 1972) (“[N]o genuine bargaining * * * can be conducted where [the] decision has already been made and implemented.”) (citation omitted) (alterations in original).
Y
For the foregoing reasons, we grant Consolidated’s petition for review and deny the Board’s application for enforcement with respect to Consolidated’s discharge of Patricia Hudson. We deny the petition for review and enforce the Board’s order in all other respects, and remand for further proceedings on the Hudson discharge consistent with this opinion..
■ So ordered. ■

. The Union and Consolidated separately settled their dispute over Weaver’s termination, so Consolidated does not seek review of that aspect of the Board’s decision.

. See Siemens Energy & Automation, Inc., 328 NLRB 1175, 1176 (1999) (upholding discharge of striker that kicked a car passing through the picket line and threw roofing tacks onto the roadway at a vehicular entrance to the employer's plant); GSM, Inc., 284 NLRB 174, 174-175 (1987) ("Conduct such as kicking, slapping, and throwing beer cans at moving vehicles is intimidating enough in and of itself,” and constitutes "violent conduct which may reasonably tend to coerce or intimidate employees in the exercise of their rights protected under the Act.”); Teamsters Local 812 (Pepsi-Cola Newburgh), 304 NLRB 111, 115-117 (1991) (“The blocking, hitting and kicking of vehicles by pickets” constituted picket line misconduct, as did a "Family Day” in'which striking employees *11 and their families carried out mass picketing, and placed themselves and their small children in front of company trucks as they attempted to leave.); CalMat Co., 326 NLRB 130, 135 (1998) (denying reinstatement for striker who "use[d] himself as a barrier so the driver would have no choice but to stop,” and then proceeded to jump up onto the company truck, tear off the door handle, and try to assault the driver and damage the truck as security guards and police officers struggled to restrain him).

. The Board ruled in the alternative that, even if Williamson's conduct had been serious enough to forfeit the protection of the Act, Consolidated failed to meet its "burden” under Wright Line, 251 NLRB 1083 (1980), "to establish that it would have suspended Williamson solely on the basis of the Tara Walters incident.” J.A. 13. That is a complete . misstatement of the law. The Wright Line test applies "when an employer has discharged (or disciplined) an employee for a reason as-sertedly unconnected to protected activity.” Shamrock Foods, 346 F.3d at 1135. It has no application to striker misconduct cases. We accordingly do not credit the Board's alternative ground for its disposition.

. Consolidated complains that the Board improperly imposed a duty on the employer to contact the police about these incidents, Such contact, while certainly not dispositive, can be a factor relevant to witness credibility and the seriousness of the misconduct in question. See, e.g., Precision Window Mfg., Inc. v. NLRB, 963 F.2d 1105, 1108 (8th Cir. 1992) (threatened employer’s call to police was evidence of the threat); Axelson, Inc., 285 NLRB 862, 865 (1987) (the "threatening, intimidating character” of striker's statement was apparent where non-striker felt threatened enough to report the incident to the police). Anyhow, the Board's reliance on that factor was limited in the Greider and Rankin incidents, and substantial evidence would exist even without consideration of that factor.

. Hudson and Weaver testified that they had not previously discussed following company vehicles, and were not able to communicate with each other during the drive because Hudson did not have a cell phone. Hudson had decided on her own to follow Conley when she saw him turning onto Route 16. Weaver testified that she followed without initially knowing what Hudson was doing, but eventually noticed the company truck and assumed Hudson was following it to see if it was going to a commercial worksite.

. The speed limit on Route 16 in that area generally ranges from 45 to 55 mph.

. Conley testified to driving a four-wheel drive Chevy truck that did not require a commercial driver’s license.

. Accordingly, the distinction Consolidated attempts to draw between following Conley and being in front of Conley on Route 16 is irrelevant, since Hudson was engaged in conduct related to the strike either way.

. That the Board had articulated the burden of proof properly earlier in the decision, J.A. 13, is.of .no help when the law is flatly misstated in the dispositive analysis of a specific argument.

. We take the Board at its word that, on remand, it will not "rely on the [ALJ’s] speculation as to what might have motivated Troy Conley’s testimony,” given die total absence of record evidence that could support the ALJ’s findings of bias, anger, or a desire to see Hudson terminated. J.A. 1 n.2.

. See LA. 55 ("February 26, 2013 was the first time the Employer informed the Union of the decision not to fill one of the ■ vacated Office Specialist positions.”); id. at 56 (Consolidated later attempted to “discuss/bargain over not filling Weaver's position” - and “offered several options regarding the Office • Specialist duties that Weaver previously performed, including 1) paying the Office Specialist who was performing new duties a premium; 2) diffusing the duties even further and sharing with other Office Specialists; or 3) moving the duties to a Company affiliate.”).