BEAM, Circuit Judge,
dissenting.
No employer in America is or can be required to employ a racial bigot. Indeed, as amicus curae National Association of Manufacturers aptly points out, the court’s requiring of the petitioner to do so here, “is tantamount to requiring that Cooper Tire violate federal anti-discrimination and hdrassment- laws, including Title VII and [42 U.S.C. § ] 1981, as well as numerous other similar state and local laws.”
For example, the Supreme Court has stated “[t]he phrase, ’terms, conditions or privileges of employment’ in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination.” Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (second alteration in original) (quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)).
Thus, the two crucial issues at work in this presently mishandled dispute are (1) whether Anthony Runion exhibited racial bigotry directed toward African American employees of Cooper Tire and (2) whether the exercise'of such bigotry is protected by *895 the terms and conditions of the National Labor Relations Act (NLRA). The answer to question one is clearly yes and the answer to query two is undoubtedly no!
Accordingly, the rulings of the NLRB in this matter should be peremptorily reversed and dismissed and the actions of Cooper Tire regarding Runion affirmed.
I. BACKGROUND
As noted by the court, Cooper Tire employs about 1000 workers in Ohio and as permitted by 29 U.S.C. § 158(a)(1) and (3) of the NLRA, Am. Ship Bldg. Co. v. NLRB, 380 U.S. 300, 301-318, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), locked out the Union employees after labor negotiations reached impasse subsequent to the expiration of its collective bargaining agreement (CBA) with the AFL-CÍO/CLC Union.
Cooper Tire continued to operate after the CBA expiration and the lockout by using replacement workers. Many, if not most, of the new employees were African Americans. They were conveyed into and out of the Cooper Tire work site in motorized vans through a picket line consisting mainly of former Union employees including Runion. A security guard recorded a video of the daily entrance proceedings including the acts of Runion. Even though its members were warned by the Union prior to the picketing not to mount racial attacks against replacement workers while in the line, Runion, on January 7, 2012, accompanied by his girlfriend’s small son, is observed and heard to say as a van of African Americans passed into the Cooper Tire plant, “Hey, did you bring enough KFC for everyone?” and “Hey, anybody smell that? I smell fried chicken and watermelon.” After the KFC statement but prior to the “smell” utterance, an unidentified voice yells “go back to Africa, you bunch of f***ing losers.” As indicated, all of these comments were directed toward vans carrying at least some African Americans. Thus, from these facts, the record establishes the ambiance created by Run-ion at the Copper Tire work site.
As also noted .by the court, in February, Cooper Tire began recalling locked-out former employees. At that time, Cooper Tire refused to re-employ Runion because of his January 7 inflammatory and disparaging race-based statements on the picket line.
At this point; I digress to agree with the court that 29 U.S.C. § 157 permits locked-oút former employees the right to picket, Am. Ship, 380 U.S. at 310 n.10, 85 S.Ct. 955, even, perhaps,' in a rough and tumble manner due to disagreeable labor circumstances. But, neither 29 U.S.C. § 157 nor § 158, permit outright racial insult and bigotry as expressed by Runion on January 7, 2012, on such a picket line established, as here, at an entrance just slightly off the edge of the employer’s property.
II. DISCUSSION
The court and the National Labor Relations Board (NLRB) limit their analyses of Cooper Tire’s purported violations of NLRA sections 157 and 158 solely within the ambience thát existed on the picket line. There is total disregard for life on the factory floor when, as here, the labor/management issues are settled and work resumes with a day-to-day labor force consisting of members of various races including at least some Runion-ma-ligned African American citizens. This is error. •. .
While there were no NLRA violations by Cooper Tire, as I will shortly establish through my discussion of the improvident reversal by the court of the well-reasoned arbitration award, any proper inquiry must clearly include the suitability, or not, of Runion, by now well-established as a racial bigot, as a continuing member of Cooper Tire’s work force in a workplace potential *896 ly involving a number of African American employees.
In this regard, I recommend and fully endorse in its entirety Judge Millett’s concurrence in Consolidated Communications, Inc. v. NLRB, 837 F.3d 1, 20-24 (D.C. Cir. 2016). For proper emphasis, I repeat here, in part, Judge Millett’s well-chosen words which are equally applicable in this dispute:
I write ... to convey my substantial concern with the too-often cavalier and enabling approach that the Board’s decisions have taken toward the sexually and racially demeaning misconduct of some employees during strikes. Those decisions have repeatedly given refuge to conduct that is not only intolerable by any standard of decency, but also illegal in every other corner of the workplace. The sexually and racially disparaging conduct that Board decisions have winked away encapsulates the very types of demeaning and degrading messages that for too much of our history have trapped women and minorities in a second-class workplace status.
While the law properly understands that rough words and strong, feelings can arise in the tense and acrimonious world of workplace strikes, targeting others for sexual or racial degradation is categorically different. Conduct that is designed to humiliate and intimate an-, other individual because of and in terms, of that person’s gender or race should be unacceptable in the work environment.
837 F.3d at 20-21 (Millett, J., concurring) (emphasis in original).
The parties’ CBA had, as earlier indicated, expired on October 31, 2011, well before the events giving rise to this litigation. But, this did not prevent them from agreeing to arbitrate this, dispute. And arbitrate they did, perhaps outside the bounds of authority of the NLRA and NLRB. But neither party raises this consideration. So, neither will I.
Arbitrator Roger C. Williams, the Permanent Impartial Arbitrator, under Article II, Paragraph A of the expired CBA agreed to function in that capacity for Runion, represented by the Union, and Cooper Tire. And, Williams carefully and correctly determined all necessary facts, correctly applied applicable law and any necessarily related contractual and legal issues. After doing so, he correctly determined that Runion was properly denied reemployment by Cooper Tire.
However, the NLRB selected one of its administrative law judges (ALJ) to review Williams’s work product. The ALJ, clearly misapplying the law, reversed the arbitrator and ordered Runion’s re-employment. The Board then affirmed.
As established in the seminal case of Spielberg Mfg. Co., 112 NLRB 1080 (1955), the NLRB is to defer to an arbitrator’s award in these circumstances if the proceedings appear to have been fair and regular,' all parties have agreed to be bound, and the decision of the arbitrator is not clearly repugnant to the purposes and policies of the Act. Olin Corp., 268 NLRB 573, 573-74 (1984). The Board itself, not the language of the NLRA, established this standard and its purported deference in order to ensure that arbitrator decisions in these circumstances are given more deference, not less. “It hardly needs repeating that national policy strongly favors the voluntary arbitration of disputes. The importance of arbitration in the overall scheme of Federal labor law has been stressed in innumerable contexts and forums.” Id. at 574. The Board itself recognizes in Olin that it has failed in its deferential duties so-to-speak, recognizing the many past decisions where the Board predictably reached decisions not to defer, which “serve[] only to frustrate the de- *897 dared purpose of Spielberg to recognize the arbitration process as an important aspect of the national labor policy favoring private resolution of labor disputes.” Id.
Certainly an arbitrator’s award need not be totally consistent with Board precedent in order to ensure deference.'In fact, according to its own proscriptions, the Board will defer unless the award is “palpably wrong” and “not susceptible to an interpretation consistent with the Act.” Id. It is universally recognized that “[ejncouragement of dispute resolution under the collective bargaining agreement through arbitration is a fundamental aim of the Act and is a matter of public policy.” Lewis v. NLRB, 800 F.2d 818, 821 (8th Cir. 1986).
Despite the Act’s intended purpose of encouraging arbitration to further dispute resolution under a collective bargaining agreement, in this case the Board predictably decided not to defer, relying upon strained pretenses and a contorted review of the arbitrator’s award to reach its desired result. Contrary to the Board’s determination that the arbitrator’s ruling was repugnant to the NLRA, the arbitrator’s award here was clearly not contrary to well-established Board precedent and, in fact, can easily be interpreted as fully consistent with the Act. The Board and the panel majority largely rely upon one statement in the arbitrator’s award as the primary basis for avoiding deference in this case. The arbitrator held that Runion’s statements “would have been serious misconduct in any context, but in the context of the picket line, where there was a genuine possibility of violence, his comments were even more serious.” Ante at 894. This, according to the Board and the court majority, is proof that the arbitrator’s award was inconsistent with established law and thus not worthy of deference. Nothing could be farther from the truth. It is equally conceivable, if not absolutely likely, that the arbitrator fully grasped established law that on the picket line, misconduct that reasonably tends to coerce or intimidate employees in the exercise of rights protected by the Act, or other federal and state law, is forbidden. Ante at 889. It is wholly reasonable to read the arbitrator’s award as acknowledging that Run-ion’s comments went beyond the rough and tumble atmosphere that has come to be tolerated on the picket line, and indeed created a genuine possibility' of coerción, intimidation, and even violence, thus taking the behavior out of the realm of protected picket-line activity.
The Union itself was clearly aware of the potential for volatility that ensues when racial, sexist, or sexually explicit language is used on the picket line, despite the higher bar tolerated for expected, highly charged, expressions in the picket-line environment. As importantly noted by the arbitrator, “[ijndeed, the Union acknowledged the inadvisability of using racist language on the picket line by including a rule prohibiting such language in the Picket Line Rules which were distributed to the picketers for the purpose of keeping the picket line peaceful and avoiding disturbances.” The racial epithets expelled by Runion were not simply tolerated, impulsive behavior. They were expressions that tended to coerce and intimidate African American employees in the exercise of rights protected under the Act.
“[Gjiving strikers- a pass on zealous expressions of frustration and discontent makes sense. Heated words and insults? Understandable. Rowdy,and raucous behavior? Sure, within lawful bounds.” Consol. Comm’cns, 837 F.3d at 22. Racial remarks are different. Engaging in union organizing or efforts to vindicate protected labor activity does not insulate the volatility and heinous nature of racist, or sexist, remarks. “Such language and behavior have nothing to do with attempted persua *898 sion about the striker’s cause. Nor do they convey any message about workplace injustices suffered, wrongs inflicted, employer mistreatment, managerial indifference, the causes of employee frustration and anger, or anything at all of relevance about working conditions or worker complaints.” Id. Discriminatory and degrading stereotypes are not legitimate weapons in economic disputes carried out .on the .picket line. “It is both ’preposterous’ and insulting to ensconce into labor law the assumption that ’employees are incapable of organizing a union or exercising their other statutory rights under the National Labor Relations Act without resort to abusive or threatening language’ targeted at a person’s gender or race.” Id. at 23 (quoting Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. NLRB, 253 F.3d 19, 26 (D. C. Cir. 2001)). Yet, the Board repeatedly broadens the protections for such repulsive, volatile, incendiary, and heinous activity time and again in cases such as these.
Accordingly, I find that the Board clearly abused its discretion when it took pains to avoid giving deference to the arbitrator’s' award in this matter.
III. CONCLUSION
In epilogué, I somewhat more completely discuss séveral relevant matters.
When the Board unleashed its “repugnant to. the purposes and policies of the Act” mandate in derogation of the arbitrator’s rulings, it mentions not a single word of legislative language. That is understandable because there is none. Such purposes and policies are wholly of the Board’s fabrication, done' so to undergird, presumably, any whim and caprice that the Board may want to employ in arriving at its various conclusions. Recently, the Supreme Court spoke with regard to arbitrary acts by administrative bodies such as the NLRB as follows, “[w]e cannot replace the actual text [of a statute} with speculation as to Congress’ intent,” Magwood v. Patterson, 561 U.S. 320, 334, 130 S.Ct. 2788, 177 L.Ed.2d 592 (2010), “[a]nd while it is of course our job to apply faithfully the law Congress has written, it is never our job to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have done had it faced a question that, on everyone’s account, it never faced.” Henson v. Santander Consumer USA Inc., — U.S. —, 137 S.Ct. 1718, 1725, 198 L.Ed.2d 177 (2017).
Finally, I note that this court again improperly expands the list of cases that support the NLRB’s pattern and practice of reconciling facts and construing issues most favorably to labor-union interests, usually by means of its cadre of ALJs, as here. See, e.g., N. Mem’l Health Care v. NLRB, 860 F.3d 639, 650-51 (8th Cir. 2017); NLRB v. Mo. Red Quarries, Inc., 853 F.3d 920, 925 (8th Cir. 2017); Beverly Enters. v. NLRB, 148 F.3d 1042, 1045-46 (8th Cir. 1998); Schnuck Markets, Inc. v. NLRB, 961 F.2d 700, 704 (8th Cir. 1992). Thus, this untethered course of action by the NLRB should be aggressively repulsed.
The Board’s Decision and Order here should be quickly reversed and the arbitrator’s ruling reinstated. From the court’s contrary conclusions, I dissent.