# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-2721
_____

Cooper Tire & Rubber Company

*Petitioner*

v.

National Labor Relations Board

*Respondent*

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial
& Service Workers International Union, AFL-CIO, CLC

*Intervenor*

------------------------------

Chamber of Commerce of the United States; Equal Employment Advisory
Council; National Association of Manufacturers; National Federation of
Independent Business Small Business Legal Center

*Amici on Behalf of Petitioner*

_____

No. 16-2944
_____

Cooper Tire & Rubber Company

*Respondent*

v.

National Labor Relations Board

*Petitioner*

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union, AFL-CIO, CLC

*Intervenor*

-----------------------------

Chamber of Commerce of the United States; Equal Employment Advisory Council; National Association of Manufacturers; National Federation of Independent Business Small Business Legal Center

*Amici on Behalf of Respondent*
_____

National Labor Relations Board
_____

Submitted: March 7, 2017
Filed: August 8, 2017
_____

Before BENTON, BEAM, and MURPHY, Circuit Judges.
_____

BENTON, Circuit Judge.

Cooper Tire & Rubber Company fired Anthony Runion for his conduct on the picket line. The union filed a grievance alleging Cooper violated the collective bargaining agreement by discharging Runion. The arbitrator upheld the discharge. The Administrative Law Judge reversed, holding that the firing violated the National Labor Relations Act, 29 U.S.C. § 151 et seq. The National Labor Relations Board

upheld the ALJ.  Having jurisdiction under 29 U.S.C. § 160(e) and (f), this court denies Cooper's petition for review and enforces the Board's order.

## I.

Cooper employs about 1,000 workers at a tire-manufacturing plant in Findley, Ohio.  Cooper locked out union employees after negotiations failed to renew the collective bargaining agreement.  During the lockout, union workers picketed outside Cooper's plant.  Cooper continued operating with replacement workers.  These workers crossed the picket line arriving and leaving the facility, mostly in Cooper's vans.  Many replacement workers were African-American.

Anthony Runion, a locked-out employee, participated in the picket line.  While picketing on the evening of January 7, 2012, he yelled, "Hey, did you bring enough KFC for everybody?" and "Hey anybody smell that?  I smell fried chicken and watermelon." The comments were directed at a van carrying replacement workers that had just crossed the picket line.  While yelling, Runion's hands were in his pockets; he made no overt physical movements or gestures.  There is no evidence the replacement workers heard Runion's statements (though dozens in the crowd did).

In February, Cooper began recalling locked-out employees.  It did not recall Runion.  It discharged him for his statements during the January 7 picket.  The union filed a grievance alleging Cooper violated the CBA by discharging Runion.  The arbitrator found "just cause" under the CBA to fire Runion.  The union then submitted the case to an ALJ, who concluded that Cooper violated the Act.  The Board upheld the ALJ and ordered Runion reinstated with back pay.  Cooper petitions for review.

## II.

Section 7 of the Act guarantees employees the right to "assist labor organizations . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." **29 U.S.C. § 157**. Section 7 gives locked-out employees the right to picket. *See Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 310 n.10 (1965). Section 8(a) prohibits an employer from interfering with, restraining, coercing, or discriminating against employees in the exercise of their Section 7 rights. **§ 158(a)(1)-(3)**.

"One of the necessary conditions of picketing is a confrontation in some form between union members and employees." *Chicago Typographical Union No. 16*, 151 NLRB 1666, 1668 (1965), *citing* **NLRB v. United Furniture Workers of Am.**, 337 F.2d 936, 940 (2d Cir. 1964). "Impulsive behavior on the picket line is to be expected especially when directed against nonstriking employees or strike breakers." **Allied Indus. Workers No. 289 v. NLRB**, 476 F.2d 868, 879 (D.C. Cir. 1973) (internal citation omitted). This court analyzes picket-line conduct under the *Clear Pine Mouldings* test: a firing for picket-line misconduct is an unfair labor practice unless the alleged misconduct "may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act." **NMC Finishing v. NLRB**, 101 F.3d 528, 531 (8th Cir. 1996), *citing* **Clear Pine Mouldings, Inc.**, 268 NLRB 1044, 1046 (1984), *enf'd*, 765 F.2d 148 (9th Cir. 1985). The test is objective. **Id.**

The Board has authority to order "reinstatement of employees with or without back pay, as will effectuate the policies" of the Act. **29 U.S.C. § 160(c)**. This court will "enforce the Board's order if it has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole, even if we might have reached a different decision had the matter been before us de novo." **NLRB v. RELCO Locomotives, Inc.**, 734 F.3d 764, 779-80 (8th Cir. 2013) (internal citation omitted). This court "generally defer[s] to the Board's discretion in ordering

-4-

a reinstatement." *NMC Finishing*, 101 F.3d at 532 (internal citation omitted). *See generally **Lechmere, Inc. v. NLRB***, 502 U.S. 527, 537 (1992) ("[T]he NLRB is entitled to judicial deference when it interprets an ambiguous provision of a statute that it administers."). This court "must deny enforcement if the Board's determination is illogical or arbitrary." ***Earle Indus., Inc. v. NLRB***, 75 F.3d 400, 405 (8th Cir. 1996).

III.

Cooper argues this court should not defer to the Board. It contends the Board should have analyzed Runion's discharge not under *Clear Pine Mouldings*, but under *Wright Line*, 251 NLRB 1083 (1980), *enf'd*, 662 F.2d 899 (1st Cir. 1981). *Wright Line* applies "when an employer has discharged (or disciplined) an employee for a reason assertedly *unconnected* to protected activity." ***Shamrock Foods Co. v. NLRB***, 346 F.3d 1130, 1135 (D.C. Cir. 2003) (emphasis in original). *See **RELCO Locomotives***, 734 F.3d at 780 ("The *Wright Line* analysis is only necessary if the employer's stated rationale for termination is not activity protected by the NLRA."). *See also **Consol. Commc'ns., Inc. v. NLRB***, 837 F.3d 1, 12 n.3 (D.C. Cir. 2016) (explaining *Wright Line* "has no application to striker misconduct cases"). In *Wright Line*, the employer claimed the employee was terminated for inaccurate recordkeeping. ***Wright Line***, 662 F.3d at 900. Here, Cooper does not allege that Runion was fired for any reason "unconnected" to participation in the picket line. This court applies *Clear Pine Mouldings* to evaluate a firing for alleged misconduct during picketing. *See **NMC Finishing***, 101 F.3d at 531.

Cooper believes that *NMC Finishing* and *Earle* "compel a finding that Cooper did not violate the Act when it discharged Runion." In *NMC Finishing*, a picketer held up a sign for five minutes that said "Who is RhondaF Sucking Today?" *Id.* at 530. The sign was directed at a specific employee crossing the picket line. *Id.* Applying *Clear Pine Mouldings*, this court concluded that the singled-out woman

would—objectively—feel coerced, intimidated, or harassed. *Id.* at 532. This court emphasized that an individual was singled out:

> *Had the offensive words been part of a package of verbal barbs thrown out during a picket line exchange* or of a sign-borne message dealing with the morals and character of crossovers generally, we might have a different view. Here, however, a specific employee was singled out and vilified by a sign paraded in the presence of everyone near to or passing by the exit gate.

*Id.* (emphasis added). Here, Runion's comments were not directed at any one individual. Nor were they on display for an extended period. Runion's words were a "package of verbal barbs thrown out during a picket line exchange." The *NMC Finishing* case supports the Board, not Cooper.

In *Earle*, the employee was fired for dishonesty and insubordination on the plant floor. *Earle*, 75 F.3d at 407. There was neither an ongoing strike nor a picket line. *Id.* at 401-03. *Earle* distinguished its facts from cases "in the context of strikes" and "grievances." *Id.* at 406 (recognizing that "in the context of strikes," there exists "the need to excuse impulsive, exuberant behavior (so long as not flagrant or rendering the employee unfit for employment) as an inevitable concomitant of struggle"). The *Earle* case does not apply here.

The Board relies on *Airo Die Casting, Inc.*, 347 NLRB 810, 811 (2006) and *Consolidated Communications*. In *Airo*, replacement workers were transported to an employer's plant during a strike. *Airo*, 347 NLRB at 811. During a picket, one picketer advanced towards the replacement workers with both middle fingers extended and screamed "f*** you n*****." *Id.* The employer fired the picketer for violating its harassment policy. The Board reversed. *Id.* at 813. The Board found the picketer's conduct "did not differ from the general atmosphere on the picket line with

-6-

the usual tensions between striker and replacement workers and the use of obscene gestures and vulgar language." *Id.* at 812. It concluded that the picketer's "use of obscene language and gestures and a racial slur, standing alone without any threats or violence, did not rise to the level where he forfeited the protection of the Act." *Id.*, *citing Clear Pine Mouldings*, 264 NLRB at 1046.

In *Consolidated Communications*, the D.C. Circuit held that a picketer who grabbed his crotch, said "f*** you," and gave the middle finger, was protected under the Act. *Consol. Commc'ns*, 837 F.3d at 6. The court ruled that while the actions were "totally uncalled for and very unpleasant," they could not objectively be perceived "as an implied threat of the kind that would coerce or intimidate a reasonable [replacement] employee from continuing to report for work." *Id.* at 12.

Because the picketers' statements in both *Airo* and *Consolidated Communications* were protected, it was not "illogical or arbitrary" for the Board to protect Runion's statements under *Clear Pine Mouldings*. *See Earle*, 75 F.3d at 405. Substantial evidence supports the Board's conclusion that Runion's statements were "not violent in character, and they did not contain any overt or implied threats to replacement workers or their property. The statements were also unaccompanied by any threatening behavior or physical acts of intimidation by Runion towards the replacement workers in the vans." This court defers to the Board's interpretation that Cooper violated the Act by discharging Runion.[1] *See Lechmere*, 502 U.S. at 537.

---

[1]This court agrees with the concurrence in *Consolidated Communications*:

We have cautioned the Board before against assuming that the use of abusive language, vulgar expletives, and racial epithets between employees is part and parcel of the vigorous exchange that often accompanies labor relations. . . . [T]he Board's decisions seem in too many cases . . . oblivious to the dark history such words and actions have had in the workplace (and elsewhere). . . . To be sure, employees' exercise of their statutory rights to oppose employer practices must be

IV.

Cooper argues that reinstating Runion conflicts with its obligations under Title VII. **42 U.S.C. § 2000e, et seq.** *See generally Southern Steamship Co. v. NLRB*, 316 U.S. 31, 47 (1942) (explaining that the Board may not "wholly ignore other and equally important Congressional objectives"). Harassment is actionable under Title VII if it is so "severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Sheriff v. Midwest Health Partners*, *P.C.*, 619 F.3d 923, 930 (8th Cir. 2010) (internal citation omitted). Stray remarks in the workplace generally are not severe or pervasive enough to change the conditions of employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[O]ffhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."). This higher standard for workplace harassment prevents attempts to use Title VII to enforce a "general civility code." *Id.*

Runion's comments—even if they had been made in the workplace instead of on the picket line—did not create a hostile work environment. *See Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1085 (8th Cir. 2010) (finding that comment about fried chicken and other incidents were insufficient to create a hostile work environment), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1058 (8th Cir. 2011) (en banc); *Reed v. Procter & Gamble Mfg. Co.*, 556 Fed. Appx. 421, 433 (6th Cir. 2014) (finding comments about fried chicken and watermelon

---

vigorously protected, and ample room must be left for powerful and passionate expressions of views in the heated context of a strike. But Board decisions' repeated forbearance of . . . racially degrading conduct in service of that admirable goal goes too far.

*Consol. Commc'ns*, 837 F.3d at 20-24 (Millett, J., concurring) (internal citations and quotation marks omitted).

insufficient). *Cf. **Dowd v. United Steelworkers of Am.***, 253 F.3d 1093, 1102 (8th Cir. 2001) (affirming jury's hostile work environment verdict where, over several days, employees crossing picket line "were subjected to racial slurs and threats of physical violence each time they drove into and out of the plant . . . picketers threw tacks down in the pathway of the plaintiffs' cars and spat on their car windows . . . [and] plaintiffs were fearful for their personal safety"); ***Ellis v. Houston***, 742 F.3d 307, 322 (8th Cir. 2014) (finding supervisor's fried-chicken-and-watermelon comments sufficient for prima facie case and recognizing that "[p]articipation by a supervisor can magnify the impact of harassment" and "such behavior by a supervisor tacitly endorses racist remarks by subordinates and indicates to other officers that this type of joke or remark is acceptable").

Cooper counters that it "has never claimed that Runion's racist statements, standing alone, would entitle the African-American replacement workers to a judgment against Cooper for a hostile work environment. . . .  Cooper's position is that it has the legal obligation under Title VII to apply its lawful policy prohibiting harassment to racist statements (even on the picket line)."  Still, Cooper was under no "legal obligation" to *fire* Runion.  *See **Bailey v. Runyon***, 167 F.3d 466, 468 (8th Cir. 1999) ("Title VII does not require an employer to fire a harasser. . . .  Rather, what an employer must do is to take prompt remedial action reasonably calculated to end the harassment." (internal citation omitted)).  *See also **Zirpel v. Toshiba Am. Info. Sys., Inc.***, 111 F.3d 80, 81 (8th Cir. 1997) (assuming there was a hostile work environment, employer's warning to harassing employee was sufficient remedial action under Title VII).  Cooper's obligations under Title VII do not conflict with Runion's reinstatement.[2]

---

[2]Cooper filed a motion to strike certain portions of both the Board and the Union Intervenor's briefs.  Because this court did not rely on any alleged disparate enforcement of Cooper's harassment policy, the motion is denied as moot.  *See **Camelot LLC v. AMC ShowPlace Theatres, Inc.***, 665 F.3d 1008, 1012 n.2 (8th Cir. 2012) ("On appeal Camelot moved to strike four pages of AMC's appendix . . . .  We

## V.

Cooper believes that because the arbitrator found "just cause" to fire Runion, the firing was also "for cause" under Section 10(c) of the Act: "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged *for cause*." **29 U.S.C. § 160(c)** (emphasis added). The Act does not define the term "for cause," so the Board has exercised its authority to interpret the ambiguity. *See **Lechmere***, 502 U.S. at 537 ("[T]he NLRB is entitled to judicial deference when it interprets an ambiguous provision of a statute that it administers."). "It is important to distinguish between the term 'cause' as it appears in Sec. 10(c) and the term 'just cause,' which . . . encompasses principles such as the law of the shop, fundamental fairness, and related arbital decisions." ***Taracorp Inc.***, 273 NLRB 221, 222 n.8 (1984). "For cause" in Section 10(c) "effectively means the absence of a prohibited reason." ***Anheuser-Busch, Inc.***, 351 NLRB 644, 647 (2007). "There is no indication . . . that [Section 10(c)] was designed to curtail the Board's power in fashioning remedies when the loss of employment stems directly from an unfair labor practice . . . ." ***Fibreboard Paper Prod. Corp. v. NLRB***, 379 U.S. 203, 217 (1964).

Here, the Board concluded that "Runion was discharged for a prohibited reason—the protected activity of engaging in picketing." Since Runion was discharged for a "prohibited reason," Cooper did not fire Runion "for cause" under Section 10(c). *See **id.***; ***Anheuser-Busch***, 351 NLRB at 647 ("Since the discipline imposed here was not imposed for a prohibited reason, it was 'for cause.'").

---

do not rely on these materials in construing the lease and deny Camelot's motion to strike as moot."). *See also **Hubbard v. Plaza Bonita, LP***, 630 Fed. Appx. 681, 684 (9th Cir. 2015) ("Hubbard's motion to strike the answering brief and supplemental excerpts of record is denied as moot because we do not rely upon the materials to which Hubbard objects.").

## VI.

Cooper argues the Board abused its discretion by not deferring to the arbitrator's award. This court reviews the Board's decision to overrule an arbitrator for an abuse of discretion. *See **Doerfer Eng'g v. NLRB***, 79 F.3d 101, 103 (8th Cir. 1996). For the Board to defer, the arbitrator's decision must not be "clearly repugnant to the purposes and policies of the Act." ***Olin Corp.***, 268 NLRB 573, 573-74 (1983). An arbitrator's decision is repugnant to the Act where it is "palpably wrong" or "not susceptible to an interpretation consistent with the Act." ***Id.*** at 574. The Board may "disregard [an arbitrator's award] if it is inconsistent with the established law." ***Local Union No. 884 v. Bridgestone/Firestone, Inc.***, 61 F.3d 1347, 1357 (8th Cir. 1995); ***Ciba-Geigy Pharm. Div.***, 264 NLRB 1013, 1016 (1982) (explaining that if an arbitrator's award "is contrary to well-established Board precedent, the award will be deemed repugnant to the Act and not entitled to deferral").

Cooper asserts that the arbitrator's opinion is not "palpably wrong" because it is consistent with *Atlantic Steel Co.*, 245 NLRB 814, 820-21 (1979). *Atlantic Steel* involved an employee's outburst on the factory floor. It articulated a balancing test whether that outburst removes the worker from the Act's protection. ***Id.*** at 816. The *Atlantic Steel* framework applies to employee misconduct in the workplace—not on the picket line. *See **Triple Play Sports Bar & Grille***, 361 NLRB 31, 34 (2014) ("[T]he *Atlantic Steel* framework is not well suited to address . . . employees' off-duty, offsite [communications] with other employees or with third parties.").

Cooper believes that the Board should defer to the arbitrator as it did in *Spielberg Mfg. Co.*, 112 NLRB 1080, 1082 (1955). *Spielberg* is distinguished on its facts; there, the striking employees had persistently shouted racist slurs over several days of picketing. *See **id.*** at 1084-86. Runion's statements here were neither persistent nor over several days. According to Cooper, deference is appropriate because the Board in *Spielberg* deferred to an arbitration award inconsistent with

then-existing precedent. The Board's deference there—regardless of then-existing precedent—does not require deference under the different facts here.

The Board reasons that the arbitrator used the wrong standard to adjudicate Runion's statements. The arbitrator said Runion's statements "would have been serious misconduct in any context, but in the context of the picket line, where there was a genuine possibility of violence, his comments were even more serious." The arbitrator's view that a "genuine possibility of violence" made Runion's comments "even more serious" is contrary to well-established precedent giving greater protection to picket-line misconduct. *See Consol. Commc'ns*, 837 F.3d at 8 ("The striker-misconduct standard thus offers misbehaving employees greater protection from disciplinary action than they would enjoy in the normal course of employment."). This precedent accounts for the "rough and tumble" atmosphere of picket lines. *See NMC Finishing*, 101 F.3d at 531 (describing picketing as part of the "rough and tumble economic activity established by Congress through the NLRA"); *Chicago Typographical Union*, 151 NLRB at 1669 (recognizing that "one of the necessary conditions of picketing is a confrontation in some form between union members and employees" (citation omitted)); *In re United Bhd. of Carpenters*, 355 NLRB 797, 802 (2010) ("Th[e] element of confrontation has long been central to our conceptions of picketing . . . .").

The arbitrator's view that Runion's comments were "even more serious" because they were made "in the context of the picket line" is inconsistent with established law. *See Local Union No. 884*, 61 F.3d at 1357. The Board did not abuse its discretion by not deferring to the arbitrator. *See id.; Olin Corp.*, 268 NLRB at 573-74.

\* \* \* \* \* \* \*

Cooper's petition for review is denied, and the Board's order enforced.

-12-

BEAM, Circuit Judge, dissenting.

No employer in America is or can be required to employ a racial bigot. Indeed, as amicus curae National Association of Manufacturers aptly points out, the court's requiring of the petitioner to do so here, "is tantamount to requiring that Cooper Tire violate federal anti-discrimination and harassment laws, including Title VII and [42 U.S.C. §] 1981, as well as numerous other similar state and local laws."

For example, the Supreme Court has stated "[t]he phrase, 'terms, conditions or privileges of employment' in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination." Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986) (second alteration in original) (quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)).

Thus, the two crucial issues at work in this presently mishandled dispute are (1) whether Anthony Runion exhibited racial bigotry directed toward African American employees of Cooper Tire and (2) whether the exercise of such bigotry is protected by the terms and conditions of the National Labor Relations Act (NLRA). The answer to question one is clearly yes and the answer to query two is undoubtedly no!

Accordingly, the rulings of the NLRB in this matter should be peremptorily reversed and dismissed and the actions of Cooper Tire regarding Runion affirmed.

## I.      BACKGROUND

As noted by the court, Cooper Tire employs about 1000 workers in Ohio and as permitted by 29 U.S.C. § 158(a)(1) and (3) of the NLRA, Am. Ship Bldg. Co. v. NLRB, 380 U.S. 300, 301-318 (1965), locked out the Union employees after labor

-13-

negotiations reached impasse subsequent to the expiration of its collective bargaining agreement (CBA) with the AFL-CIO/CLC Union.

Cooper Tire continued to operate after the CBA expiration and the lockout by using replacement workers. Many, if not most, of the new employees were African Americans. They were conveyed into and out of the Cooper Tire work site in motorized vans through a picket line consisting mainly of former Union employees including Runion. A security guard recorded a video of the daily entrance proceedings including the acts of Runion. Even though its members were warned by the Union prior to the picketing not to mount racial attacks against replacement workers while in the line, Runion, on January 7, 2012, accompanied by his girlfriend's small son, is observed and heard to say as a van of African Americans passed into the Cooper Tire plant, "Hey, did you bring enough KFC for everyone?" and "Hey, anybody smell that? I smell fried chicken and watermelon." After the KFC statement but prior to the "smell" utterance, an unidentified voice yells "go back to Africa, you bunch of f***ing losers." As indicated, all of these comments were directed toward vans carrying at least some African Americans. Thus, from these facts, the record establishes the ambiance created by Runion at the Cooper Tire work site.

As also noted by the court, in February, Cooper Tire began recalling locked-out former employees. At that time, Cooper Tire refused to re-employ Runion because of his January 7 inflammatory and disparaging race-based statements on the picket line.

At this point, I digress to agree with the court that 29 U.S.C. § 157 permits locked-out former employees the right to picket, Am. Ship, 380 U.S. at 310 n.10, even, perhaps, in a rough and tumble manner due to disagreeable labor circumstances. But, neither 29 U.S.C. § 157 nor § 158, permit outright racial insult and bigotry as expressed by Runion on January 7, 2012, on such a picket line established, as here, at an entrance just slightly off the edge of the employer's property.

## II.    DISCUSSION

The court and the National Labor Relations Board (NLRB) limit their analyses of Cooper Tire's purported violations of NLRA sections 157 and 158 solely within the ambience that existed on the picket line. There is total disregard for life on the factory floor when, as here, the labor/management issues are settled and work resumes with a day-to-day labor force consisting of members of various races including at least some Runion-maligned African American citizens. This is error.

While there were no NLRA violations by Cooper Tire, as I will shortly establish through my discussion of the improvident reversal by the court of the well-reasoned arbitration award, any proper inquiry must clearly include the suitability, or not, of Runion, by now well-established as a racial bigot, as a continuing member of Cooper Tire's work force in a workplace potentially involving a number of African American employees.

In this regard, I recommend and fully endorse in its entirety Judge Millett's concurrence in Consolidated Communications, Inc. v. NLRB, 837 F.3d 1, 20-24 (D.C. Cir. 2016). For proper emphasis, I repeat here, in part, Judge Millett's well-chosen words which are equally applicable in this dispute:

> I write . . . to convey my substantial concern with the too-often cavalier and enabling approach that the Board's decisions have taken toward the sexually and racially demeaning misconduct of some employees during strikes. Those decisions have repeatedly given refuge to conduct that is not only intolerable by any standard of decency, but also illegal in every other corner of the workplace. The sexually and racially disparaging conduct that Board decisions have winked away encapsulates the very types of demeaning and degrading messages that for too much of our history have trapped women and minorities in a second-class workplace status.

While the law properly understands that rough words and strong feelings can arise in the tense and acrimonious world of workplace strikes, targeting others for sexual or racial degradation is categorically different. Conduct that is designed to humiliate and intimate another individual *because of and in terms of that person's gender or race* should be unacceptable in the work environment.

837 F.3d at 20-21 (Millett, J., concurring) (emphasis in original).

The parties' CBA had, as earlier indicated, expired on October 31, 2011, well before the events giving rise to this litigation. But, this did not prevent them from agreeing to arbitrate this dispute. And arbitrate they did, perhaps outside the bounds of authority of the NLRA and NLRB. But neither party raises this consideration. So, neither will I.

Arbitrator Roger C. Williams, the Permanent Impartial Arbitrator, under Article II, Paragraph A of the expired CBA agreed to function in that capacity for Runion, represented by the Union, and Cooper Tire. And, Williams carefully and correctly determined all necessary facts, correctly applied applicable law and any necessarily related contractual and legal issues. After doing so, he correctly determined that Runion was properly denied re-employment by Cooper Tire.

However, the NLRB selected one of its administrative law judges (ALJ) to review Williams's work product. The ALJ, clearly misapplying the law, reversed the arbitrator and ordered Runion's re-employment. The Board then affirmed.

As established in the seminal case of Spielberg Mfg. Co., 112 NLRB 1080 (1955), the NLRB is to defer to an arbitrator's award in these circumstances if the proceedings appear to have been fair and regular, all parties have agreed to be bound, and the decision of the arbitrator is not clearly repugnant to the purposes and policies of the Act. Olin Corp., 268 NLRB 573, 573-74 (1984). The Board itself, not the

language of the NLRA, established this standard and its purported deference in order to ensure that arbitrator decisions in these circumstances are given *more* deference, not less. "It hardly needs repeating that national policy strongly favors the voluntary arbitration of disputes. The importance of arbitration in the overall scheme of Federal labor law has been stressed in innumerable contexts and forums." Id. at 574. The Board itself recognizes in Olin that it has failed in its deferential duties so-to-speak, recognizing the many past decisions where the Board predictably reached decisions *not* to defer, which "serve[] only to frustrate the declared purpose of Spielberg to recognize the arbitration process as an important aspect of the national labor policy favoring private resolution of labor disputes." Id.

Certainly an arbitrator's award need not be totally consistent with Board precedent in order to ensure deference. In fact, according to its own proscriptions, the Board will defer unless the award is "palpably wrong" and "not susceptible to an interpretation consistent with the Act." Id. It is universally recognized that "[e]ncouragement of dispute resolution under the collective bargaining agreement through arbitration is a fundamental aim of the Act and is a matter of public policy." Lewis v. NLRB, 800 F.2d 818, 821 (8th Cir. 1986).

Despite the Act's intended purpose of *encouraging* arbitration to further dispute resolution under a collective bargaining agreement, in this case the Board predictably decided *not* to defer, relying upon strained pretenses and a contorted review of the arbitrator's award to reach its desired result. Contrary to the Board's determination that the arbitrator's ruling was repugnant to the NLRA, the arbitrator's award here was clearly not contrary to well-established Board precedent and, in fact, can easily be interpreted as fully consistent with the Act. The Board and the panel majority largely rely upon one statement in the arbitrator's award as the primary basis for avoiding deference in this case. The arbitrator held that Runion's statements "would have been serious misconduct in any context, but in the context of the picket line, where there was a genuine possibility of violence, his comments were even more serious." Ante

at 12. This, according to the Board and the court majority, is proof that the arbitrator's award was inconsistent with established law and thus not worthy of deference. Nothing could be farther from the truth. It is equally conceivable, if not absolutely likely, that the arbitrator fully grasped established law that on the picket line, misconduct that reasonably tends to coerce or intimidate employees in the exercise of rights protected by the Act, or other federal and state law, is forbidden. Ante at 4. It is wholly reasonable to read the arbitrator's award as acknowledging that Runion's comments went *beyond* the rough and tumble atmosphere that has come to be tolerated on the picket line, and indeed created a genuine possibility of coercion, intimidation, and even violence, thus taking the behavior out of the realm of protected picket-line activity.

The Union itself was clearly aware of the potential for volatility that ensues when racial, sexist, or sexually explicit language is used on the picket line, despite the higher bar tolerated for expected, highly charged, expressions in the picket-line environment. As importantly noted by the arbitrator, "[i]ndeed, the Union acknowledged the inadvisability of using racist language on the picket line by including a rule prohibiting such language in the Picket Line Rules which were distributed to the picketers for the purpose of keeping the picket line peaceful and avoiding disturbances." The racial epithets expelled by Runion were not simply tolerated, impulsive behavior. They were expressions that tended to coerce and intimidate African American employees in the exercise of rights protected under the Act.

"[G]iving strikers a pass on zealous expressions of frustration and discontent makes sense. Heated words and insults? Understandable. Rowdy and raucous behavior? Sure, within lawful bounds." Consol. Comm'cns, 837 F.3d at 22. Racial remarks are different. Engaging in union organizing or efforts to vindicate protected labor activity does not insulate the volatility and heinous nature of racist, or sexist, remarks. "Such language and behavior have nothing to do with attempted persuasion

-18-

about the striker's cause. Nor do they convey any message about workplace injustices suffered, wrongs inflicted, employer mistreatment, managerial indifference, the causes of employee frustration and anger, or anything at all of relevance about working conditions or worker complaints." Id. Discriminatory and degrading stereotypes are not legitimate weapons in economic disputes carried out on the picket line. "It is both 'preposterous' and insulting to ensconce into labor law the assumption that 'employees are incapable of organizing a union or exercising their other statutory rights under the National Labor Relations Act without resort to abusive or threatening language' targeted at a person's gender or race." Id. at 23 (quoting Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. NLRB, 253 F.3d 19, 26 (D. C. Cir. 2001). Yet, the Board repeatedly broadens the protections for such repulsive, volatile, incendiary, and heinous activity time and again in cases such as these.

Accordingly, I find that the Board clearly abused its discretion when it took pains to avoid giving deference to the arbitrator's award in this matter.

## III.   CONCLUSION

In epilogue, I somewhat more completely discuss several relevant matters.

When the Board unleashed its "repugnant to the purposes and policies of the Act" mandate in derogation of the arbitrator's rulings, it mentions not a single word of legislative language. That is understandable because there is none. Such purposes and policies are wholly of the Board's fabrication, done so to undergird, presumably, any whim and caprice that the Board may want to employ in arriving at its various conclusions. Recently, the Supreme Court spoke with regard to arbitrary acts by administrative bodies such as the NLRB as follows, "[w]e cannot replace the actual text [of a statute] with speculation as to Congress' intent," Magwood v. Patterson, 561 U.S. 320, 334 (2010), "[a]nd while it is of course our job to apply faithfully the law Congress has written, it is never our job to rewrite a constitutionally valid statutory

text under the banner of speculation about what Congress might have done had it faced a question that, on everyone's account, it never faced." Henson v. Santander Consumer USA Inc., 137 S. Ct. 1718, 1725 (2017).

Finally, I note that this court again improperly expands the list of cases that support the NLRB's pattern and practice of reconciling facts and construing issues most favorably to labor-union interests, usually by means of its cadre of ALJs, as here. See, e.g., N. Mem'l Health Care v. NLRB, 860 F.3d 639, 650-51 (8th Cir. 2017); NLRB v. Mo. Red Quarries, Inc., 853 F.3d 920, 925 (8th Cir. 2017); Beverly Enters. v. NLRB, 148 F.3d 1042, 1045-46 (8th Cir. 1998); Schnuck Markets, Inc. v. NLRB, 961 F.2d 700, 704 (8th Cir. 1992). Thus, this untethered course of action by the NLRB should be aggressively repulsed.

The Board's Decision and Order here should be quickly reversed and the arbitrator's ruling reinstated. From the court's contrary conclusions, I dissent.

_____